## The People v. John Montague.

*Criminal law—Receiving stolen property—Evidence.*

In this case it is held that there was no evidence that the **property** received by respondent was *stolen* property, and the verdict is set aside and the respondent discharged.

Error to recorder's court of Detroit.    (Swift, J.)    Argued June 27, 1888.    Decided July 11, 1888.

Respondent was convicted of receiving *stolen* property. Conviction set aside and prisoner discharged. The facts are stated in the opinion.

*Edwin F. Conely*, for respondent.

*Moses Taggart*, Attorney General, and *George F. Robison*, Prosecuting Attorney, for the people.

[Briefs confined to a discussion of the testimony.— REPORTER.]

LONG, J.    The respondent was convicted in the circuit court for the county of Wayne, on April 20, 1888, for feloniously receiving stolen property, knowing the same to have been stolen, and brings the case into this Court by writ of error.

The charge contained in the information is that respondent, on January 14, 1888, at the city of Detroit, in the county aforesaid, one seal-skin sacque, of the value of $150, of the personal property, goods, and chattels of William H. Alms and William F. Doepke, of the city of Cincinnati, in the state of Ohio, copartners, doing business under the firm name of Alms & Doepke, then lately before from the possession of the said William H. Alms and William F. Doepke, doing business as aforesaid, feloniously stolen, taken, and carried away, feloniously did receive, have, and aid in concealing; he, the said John Montague, then and there, at the time he so received, had, and aided in the concealment of said personal property, goods, and chattels, as aforesaid, well knowing the same to have been feloniously stolen, taken, and carried away, contrary to the form of the statute, etc.

The only question in the case which we need consider is, was there any evidence given to warrant the conviction? I have carefully read all the evidence given,—the whole

of the evidence taken on the trial is returned to this Court,—and from such examination am led to the conclusion that there was no evidence that the sacque in question was feloniously stolen, taken, and carried away from the store of Alms & Doepke at Cincinnati. It was incumbent on the prosecution to establish, by competent evidence, and beyond reasonable doubt, not only that the respondent feloniously received the property knowing it had been stolen, but that the same had been feloniously stolen, taken, and carried away.

The theory and claim of the prosecution was that on December 23, 1887, a woman whom the respondent afterwards registered as his wife at the Wabash Hotel, in the city of Detroit, was in Cincinnati, Ohio, and went into the business house of Alms & Doepke on the pretense of purchasing a seal-skin sacque, and while there feloniously took and carried away the sacque in question; and some evidence was given that the respondent was in Cincinnati about the same time; that the sacque was brought to Detroit, where the respondent attempted to make sale of it at much below its real value.

The evidence given in the case is summarized in the brief of the prosecuting attorney as follows:

"Emma Clarke, a witness called for the people, testified that on January 14, 1888, about four o'clock in the afternoon, two men, named Whalen and O'Day, came to her house, and tried to sell her a seal-skin sacque, but she did not purchase, because it was a misfit, and the two men went away. About two hours afterwards, respondent, Whalen, and O'Day returned to her house with a larger sacque, which she tried on and agreed to purchase.

"At that time, respondent talked with her about the smaller sacque, claimed and exercised ownership, and offered to sell it to her at a very low price. The price agreed upon for the larger sacque was $100. She did not have all the purchase price with her, and respondent was unwilling she should take the sacque without paying

in full. He took the sacque away, and agreed that she and Whalen should go to the bank, and procure the balance of the money, when Whalen was to conduct her to where the respondent was stopping.

"She identified a sacque produced in court as the one shown her by respondent, which she agreed to buy."

On her cross-examination, however, she was asked:

" *Q.* What induced you to distinguish this sacque from any other sacque that might have been offered you?

"*A.* I don't know as I know.

" *Q.* You have no means, have you?

"*A.* No, sir; not exactly."

"Charles O'Day, called by the people, testified that he met respondent at the Wabash Hotel about five or six o'clock the day he was arrested, January 14, in company with Whalen. Before that time he and Whalen had been to Emma Clarke's house with a seal-skin sacque. From the Wabash Hotel the three went to Mrs. Clarke's again, where she tried on another sacque, and announced herself as satisfied with it. The sacque came from the Wabash Hotel.

"Thomas Bolles testified that he was proprietor of the Wabash Hotel; that on January 12 respondent and a woman whom respondent registered as his wife, came to the hotel, and registered as from Cleveland, Ohio. They stayed at the hotel until respondent was arrested, occupying a room together. The woman went away the same evening of the arrest. She was last seen, about 15 minutes before the arrest, in the dining-room. Witness saw the woman at the Essex House, in Windsor, the day before the trial. A man by the name of Hoebel (one of the witnesses of the people), was present when witness saw her in Windsor. The two seal-skin sacques in court were found in a room in the vicinity of respondent's room the evening of the arrest.

"C. R. Tuttle and Ralph A. Crawford testified that they were police officers, and talked with respondent two days after his arrest. They asked him whose sacques those were he was trying to sell, and he replied that he knew nothing about any sacques, hadn't seen any, and had not been out of the hotel the day he was arrested.

"Jeremiah Sullivan, a police officer, testified that he had known respondent for a year; that his business was a prize-fighter; that he saw him at the Wabash Hotel the

71 MICH.—21.

day he was arrested, and also on Jefferson avenue, between Griswold street and Woodward avenue, the same day.

"August Hoebel testified that he was the floor-manager in the fur department of Alms & Doepke, a firm in Cincinnati, Ohio; that the day before the trial he was at the Essex House, in Windsor, and saw the woman whom witness Bolles had identified as respondent's wife. Saw her at Alms & Doepke's store, in Cincinnati, December 23, 1887, at about 6 o'clock in the evening, just as the store was closing. She was in the fur department, trying to buy a cloak. She seemed hard to fit, and tried on several cloaks. She was left alone in the fitting-room when the salesman went to the sales-room to get sacques. She always asked for the best garments. She finally selected one and directed it sent to the Walnut-street House, C. O. D., giving her name as C. A. Carver. The price of the sacque was $360.

"A collector was sent with the sacque (witness volunteered testimony to the effect that the collector returned, and said there was no such person stopping at the Walnut-street House, which was afterwards stricken out by the court), and subsequently returned with it, and it was never delivered. Witness also identified a photograph as a photograph of the woman he saw in Cincinnati and Windsor. Saw the photograph at the time of the examination in the police court, before he saw the woman in Windsor, and identified it then.

"Albert Boeberitz and Joseph Manning testified that they had seen the woman identified as respondent's wife stopping at the Essex House, in Windsor, and that the photograph shown witness Hoebel was a photograph of her.

"Jeremiah Sullivan testified that he got the photograph out of the trunk in the room occupied at the Wabash Hotel by respondent and his wife; that there was then written on the back of the photograph: 'I am at my mother's. Em. Montague.'

"J. J. Lichstenstein testified that he was superintendent of the manufacturing department of Alms & Doepke in Cincinnati. He identified the sacque in question, by various marks, as one manufactured by him for that firm. They were the factory mark, stencil mark, initials of the firm, factory number, name of cutter, number of the lot, all marked on the skins inside the lining. There was also a mark, an embroidered silk mark, similar to that sewed on

the inside of a man's coat-collar, sewed on the inside of the collar of the sacque, which had been ripped off. Witness last saw this sacque December 21 or 22, when he showed it to a particular friend of his. There were only two of the size of this sacque in stock. The sacque was not missed until between the 15th and 20th of January. This sacque was worth from $225 to $235.

"There were about 75 clerks employed on the same floor in which the fur department was. Witness testified that this sacque was numbered 220. The other sacque, which he spoke of as being of the same size, was numbered 219. On each sacque there was sewed a ticket, on which there was written the bust measure and the length, the number of skins in the garment, the size and number of the lot of skins, and the wholesale and retail price. In the ordinary course of business, when a sacque was sold, this ticket would be taken off. Upon it would be written the name of the purchaser, and the price at which it was sold. A duplicate of this ticket would be made and fastened to the sacque, and go out with it. A sacque could not pass the wrapping desk without this duplicate on it. The original ticket is kept in a box in the store. After witness missed this sacque, he looked through this box, but the ti'ket was not there.

"Thomas J. Windsey testified that he lived in Cincinnati. On December 22, he saw respondent in Pete Nolan's saloon, in that city, offering to fight any one for from $50 to $500. He was then under the influence of liquor.

"Mrs. J. A. Campbell testified, on behalf of respondent, that she was wife of the proprietor of the Essex House, Windsor; that she knew the woman whom the witness had identified as the wife of respondent; that the photograph which had been identified as her photograph did not in any way resemble her. She did not know who the woman was. She was stopping there under the name of Mrs. Miller, and had been there nearly three months."

It is beyond controversy that the supposed loss of the sacque was not discovered until January 18 or 20, though on January 1 an inventory of the stock had been taken; and there is no proof that the sacque was not taken by some one of the numerous customers who went in and out of the store between those dates, and in fact the tes-

timony is not satisfactory that the sacque was stolen at all. It does not appear that this woman took anything from the store on that day, or that she had any opportunity to take anything without discovery.

The testimony of the witness Lichstenstein shows that he was one of five salesmen. He did not have the exclusive charge, nor was he in possession exclusively of all knowledge on the point to which his attention was called. The testimony, taken as a whole, would have fallen far short of sustaining a conviction of the woman had she been on trial for the larceny of the sacque; and I think it falls far short of showing any larceny of the sacque.

At the close of the testimony, the counsel for the respondent asked the court to discharge the respondent. This the court refused to do, but stated:

" So far as this case is concerned, I am very strongly inclined to state what my opinion is, but at the same time the people have been at considerable expense in the prosecution of this case, and I have concluded to leave the matter to the jury, and let the counsel argue it."

This fact can have no weight, and we think the court should have directed the jury that there was no evidence of the larceny of the sacque, and have directed the discharge of the respondent.

The verdict of the jury must be set aside, and respondent discharged.

The other Justices concurred.